# United States Court of Appeals
## For the First Circuit

_____

No. 24-1235

UNITED STATES

Appellee,

v.

NIVALDO DA CONCEICAO-LEVEL,

Defendant - Appellant.

_____

On appeal from the United States District Court
for the District of Puerto Rico

_____

**APPELLANT'S OPENING BRIEF**

_____

Leonardo M. Aldridge
Counsel for the Defendant
First Circuit Bar #15847
ECIJA-SBGB Law Offices
Miramar Plaza, Second Floor
P.O. Box 363068
San Juan, P.R. 00907
Phone: (787) 370-9024
E-mail: leoaldridge@hotmail.com

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES…………………………………………………………...

JURISDICTIONAL STATEMENT…………………….……………………..1

STATEMENT OF THE ISSUES……………………………………………...1

STATEMENT OF THE CASE………………………………………………..1

SUMMARY OF THE ARGUMENT……………………………………...19

ARGUMENTS…………………………………………………………………20

    I.    The district court erred in applying the dangerous weapon enhancement to Mr. Da Conceicao under U.S.S.G. § 2D1.1(b)(1)……………………20

    II.    The district court erred in denying Mr. Da Conceicao a mitigating role adjustment under U.S.S.G. § 3B1.2……………………………………..24

    III.    The district court erred in denying Mr. Da Conceicao a departure for duress or coercion under U.S.S.G. § 5K2.12………………………………….28

CONCLUSION………………………………………………………………...30

REQUEST FOR ORAL ARGUMENT…………………………………...31

CERTIFICATE OF COMPLIANCE…………………………………...31

CERTIFICATE OF SERVICE……………………………………………32

# TABLE OF AUTHORITIES

**Cases**                                                        **Pages**

*Gall v. United States*, 552 U.S. 38, 46, 128 S.Ct. 586 (2007)………………………24

*United States v. Amparo*, 961 F.2d 288, 291 (1st Cir. 1992)………………………29

*United States v. Arias-Mercedes*, 901 F.3d 1, 7-8 (1st Cir. 2018)…………………26

*United States. v. Arthurs*, 73 F.3d 444, 448 (1st Cir. 1996)…………………………29

*United States v. Bianco*, 922 F.2d 910, 911 (1st Cir. 1991)……………………20, 21

*United States v. Burgos-Figueroa*, 778 F.3d 310, 320 (1st Cir. 2015)………….20, 21

*United States v. Camuti*, 950 F.2d 72, 74 (1st. Cir. 1991)…………………………..20

*United States v. Corcimiglia*, 967 F.2d 724, 726 (1st Cir. 1992)………………20, 21

*United States v. David*, 940 F.2d 722, 739 (1st Cir.) cert. denied, 502 U.S. 989
(1991)………………………………………………………………….…..20

*United States v. Demers*, 13 F.3d 1381, 1384 (9th Cir. 1994)………………………25

*United States v. Díaz-Lugo*, 963 F.3d 145, 151 (1st Cir. 2020)……………..……..24

*United States v. Flores-Machicote*, 706 F.3d 16, 20 (1st Cir. 2013)……………24, 28

*United States v. Gonzalez-Vazquez*, 34 F.3d 19, 24 (1st Cir. 1994)…………………21

*United States v. Graciani,* 61 F.3d 70, 75 (1st Cir. 1995)……………………………24

*United States v. Herman*, 848 F.3d 55, 58 (1st Cir. 2017)…………………………...28

*United States v. Lagasse*, 87 F.3d 18, 23 (1st Cir. 1996)…………………..10, 21, 22

*United States v. McDonald*, 121 F.3d 7, 9 (1st Cir. 1997)…………………………...21

*United States v. Paulino*, 887 F.2d 358, 359 (1st Cir. 1989)………………………20

*United States v. Quiñones-Medina*, 553 F.3d 19, 22 (1st Cir. 2009)………………25

*United States v. Rivera-Berríos*, 968 F.3d 130, 134 (1st Cir. 2020)……...………..24

*United States v. Rizzo*, 121 F.3d 794, 801 (1st Cir. 1997)…………………..………29

*United States v. Rodríguez*, 44 F.4th 1229, 1234-35 (9th Cir. 2022)………………25

*United States v. Rodríguez-Santos*, 56 F.4th 206, 221 (1st Cir. 2022)………………28

*United States v. Sklar*, 920 F.2d 107, 110-11 (1st Cir. 1990)………………………20

*United States v. Vargas*, 560 F.3d 45, 48 (1st Cir. 2009)……………………………25

**Statutes**

18 U.S.C. § 2……………………………………………………………..2, 3

18 U.S.C. § 3231…………………………………………………………...1

18 U.S.C. § 3742…………………………………………………………...1

21 U.S.C. §§ 841(a)(1)……………………………………………………..2

21 U.S.C. § 846……………………………………………………………2

21 U.S.C. § 952(a)…………………………………………………………2

21 U.S.C. § 955……………………………………………………………2, 3

21 U.S.C. § 960………………………………………………………...…..2, 3

21 U.S.C. § 963……………………………………………………………2

28 U.S.C. § 1291…………………………………………………………...1

## **Guidelines**

U.S.S.G. § 2D1.1(b)(1)………………………...…………1, 3, 5, 19, 20, 21, 22, 24

U.S.S.G. § 3B1.2……………………………………….……1, 19, 24, 25, 28

U.S.S.G. §§ 4C1.1(a)(1)-(10)………………………………………………5

U.S.S.G. §5C1.2……………………………………………………………5

U.S.S.G. § 5K2.12…………………………………..………………1, 11, 17, 19, 28

U.S.S.G § 5K2.14………………………………………………………11

## JURISDICTIONAL STATEMENT

The United States District Court for the District of Puerto Rico had jurisdiction in this case under 18 U.S.C. § 3231. On February 23, 2024, the district court entered the judgment hereby appealed. Add.[1] 1-8. Nivaldo Da Conceicao-Level filed a notice of appeal on February 27, 2024, in a timely manner. A.[2] 95. The First Circuit Court of Appeals has jurisdiction pursuant to 18 U.S.C. § 3742 and 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

**I.      Did the district court err in applying the dangerous weapon enhancement to Mr. Da Conceicao under U.S.S.G. § 2D1.1(b)(1)?**

**II.     Did the district court err in denying Mr. Da Conceicao a mitigating role adjustment under U.S.S.G. § 3B1.2?**

**III.    Did the district court err in denying Mr. Da Conceicao a departure for duress or coercion under U.S.S.G. § 5K2.12?**

## STATEMENT OF THE CASE

On November 11, 2022, a criminal complaint was filed against Mr. Da Conceicao and his co-defendant Hotaciano Pereira Dos Santos. A. 14-17. The

---

[1] The Addendum is referenced as "Add."
[2] The Appendix is referenced as "A."

affidavit attached to the criminal complaint stated that on November 11, 2022, Customs and Border Protection (CBP) Air and Marine Operations detected and tracked an airplane. A. 16. The airplane landed on Dr. Hermenegildo Ortiz Quiñones Airport in Humacao, Puerto Rico, and the CBP officers conducted an inspection of the plane, finding the defendants and 13 large bales and 3 large bundles of suspected cocaine. A. 16. The total estimated weight of the bales and bundles were more than five kilograms. A. 16.

An indictment against Mr. Da Conceicao Level and Hotaciano Pereira Dos Santos was filed on November 16, 2022, containing the following counts: A. 18-24.

- **COUNT ONE**: Narcotics Conspiracy, in violation of 21 U.S.C. §§ 841(a)(1) and 846.

- **COUNT TWO**: Possession with Intent to Distribute Narcotics Aiding and Abetting, in violation of 21 U.S.C. §§ 841(a)(1) and 18 U.S.C. § 2.

- **COUNT THREE**: Narcotics Importation Conspiracy, in violation of 21 U.S.C. §§ 952(a), 960 and 963.

- **COUNT FOUR**: Narcotics Importation Aiding and Abetting, in violation of 21 U.S.C. §§ 952(a) and 960 and 18 U.S.C. § 2

- **COUNT FIVE**: Conspiracy to Possess Controlled Substances Aboard an Aircraft, in violation of 21 U.S.C. §§ 955, 960 and 963.

- **COUNT SIX**: Possession of Controlled Substances Aboard an Aircraft Aiding and Abetting, in violation of 21 U.S.C. §§ 955 and 960 and 18 U.S.C. § 2.

After many meetings with the U.S. Attorneys Office, and status conferences in court, on November 2, 2023, Mr. Da Conceicao Level entered a Straight Plea as to all Counts of the Indictment. A. 9, *Docket No*. 68. The U.S. Probation Office filed the PSR on December 29, 2023. SA[3]. 1-21. The total offense level calculated for Mr. Da Conceicao was 39. SA. 11. The first disclosed PSR placed Mr. Da Conceicao, a first time non-violent offender, in a guideline range of 262-327 months of imprisonment. SA. 14.

### A. Objections to the PSR.

The defense made informal objections to the PSR on January 2, 2024. A. 25-34. The first objection was to Paragraph 42: Specific Offense Characteristics – Weapon's enhancement under USSG §2D1.1(b)(1) in relation to a hunting knife found in the plane. A. 26. Specifically, the defense objected to the knife being considered a dangerous weapon because it is a standard pilot necessity for flying, especially small planes over difficult terrain, and that hundreds of kilos of cocaine cannot be effectively defended with the use of a knife. A. 26. The defense also

---

[3] The Sealed Appendix is referenced as "SA."

pointed out that the knife was in the physical possession of the co-defendant and not Mr. Da Conceicao. A. 26.

Regarding the knife, the defense also submitted that if it is going to be calculated in the guidelines as a weapon, it was reasonably foreseeable for Mr. Da Conceicao to know about the knife but not that he actually possessed it because it was in possession of his co-defendant. A. 26. The importance of this objection is that one of these categories would make Mr. Da Conceicao eligible for the safety valve and for the zero point reduction in the new guidelines. A. 26.

The second objection by the defense was regarding the failure of the PSR to acknowledge that Mr. Da Conceicao qualified for the safety valve, that he was debriefed twice, that the government believed him and, therefore, according to the law, he should be given a 2-level reduction for his compliance. A. 28. The third objection to the PSR was for not incorporating the zero-point two-level reduction. A. 29. The fourth objection was regarding the drug quantity. A. 29-30. In the fifth objection the defense argued that Mr. Da Conceicao acted under duress as defined by the guidelines. A. 30-31. Lastly, in its sixth objection the defense argued that Mr. Da Conceicao was a minor participant in the drug endeavor, like his co-defendant (who was afforded that status in his plea agreement). A. 32-34.

**B. The Amended PSR.**

On February 16, 2024, the U.S. Probation Office filed an Amended Presentence Report. SA. 25-44. Changes were made as to the base offense level in paragraph 41 because of the calculation of the drug quantity, which went from 38 to 36. SA. 35. Regarding the safety valve, a footnote was added in paragraph 44 to explain that "[i]f the defendant meets the criteria set forth in paragraphs (1)-(5) of subsection (a) of §5C1.2 (Limitation on Applicability of Statutory Minimum Sentences in Certain Cases), the offense level will be decreased by 2 levels, at sentencing." SA. 34.

Regarding the knife, the Amended PSR added a footnote to paragraph 42 stating that pursuant to U.S.S.G. 2D1.1, comment (n.11(A)), the enhancement should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense, and the defendant bears the burden of demonstrating that the connection was clearly improbable once it has been shown that a weapon was present. SA. 34. The Adjusted Offense level was also changed to 40 and two points were deducted pursuant U.S.S.G. §§ 4C1.1(a)(1)-(10), in addition to the deduction for acceptance of responsibility that was present in the previous PSR. SA. 34. A footnote was added regarding the deduction for the defendant being a Zero-Point Offender, explaining that it was determined that a weapon was possessed but the connection with the offense was not established. SA. 35. Therefore, the defendant qualified for the two-level decrease. The Total Offense

Level was calculated at 35. SA. 35. The guideline imprisonment range for Mr. Da Conceicao changed to 168 months to 210 months, based on a total offense level of 35 and a criminal history category of I. SA. 38.

### C. Sentencing Memorandums.

On February 19, 2024, the defense submitted a Sentencing Memorandum for Mr. Da Conceicao, explaining his background and his specific requests regarding sentencing. SA. 65. Mr. Da Conceicao is a pilot who ran the Skyline Aviation School in his native Roraima, in Brazil, with his wife, Poliana. SA. 65. He was going through a rough patch, as Skyline Aviation entered a financial slump during the height of the covid pandemic. SA. 65. Therefore, Mr. Da Conceicao thought he would get some gigs flying for mining ventures scattered through the Amazons, which he had done before, to supplement the income needed to support a family of four. SA. 65.

This is when Mr. Da Conceicao was approached by a former student who told him that a mining venture in Venezuela needed an experienced pilot like him. SA. 65 Mr. Da Conceicao agreed to go see what the job was about, but he did not commit. It was a complicated trip, requiring a 24-hour car ride, a boat to cross a river and several stretches of off-road in motorcycles. SA. 65. Mr. Da Conceicao and the student spent the next weeks and months waiting in an encampment deep in the

Amazon wilderness. SA. 66. At this moment, it became clear that this was not a mining job, but an operation base for high-level narcotraffickers, with a heavy presence of armed soldiers from the guerrilla group known as the Fuerzas Armadas Revolucionarias de Colombia, or FARC. SA. 66.

At this juncture, Mr. Da Conceicao understood that he could not just tell his minders that he was about to go home. SA. 66. Mr. Da Conceicao felt trapped and, even if he could evade the guerrilla members and narcotraffickers to escape home, he was nevertheless in the middle of the forests in the Venezuelan side of the Amazons. SA. 66 He would have been lost to the jungle in a matter of hours. SA. 66.

The defense requested a downward adjustment or variance because Mr. Da Conceicao acted under duress. SA. 66. Mr. Da Conceicao argued that, even though it would not have been successful at trial as an affirmative defense, the duress defense is still available, in a lesser form, as part of mitigation. SA. 67. The evidence to support a departure under this defense is somewhat less than what is necessary to support this affirmative defense at trial. SA. 67. As evidence, the defense submitted that Mr. Conceicao told the government and the U.S. Probation Office that he "took part in this flight for the following reasons: he was transported from Brazil to Venezuela under the promise of work transporting items related to mining; the trip was onerous and required cars, motorcycles and boats; once he arrived at the

location, he was guarded and surrounded by armed members of what appeared to be a paramilitary and/or narcotrafficking organization; he could not leave because he understood that, if he attempted to do so, he would be killed as he had by then learned what was going on in the encampment; and he could not simply leave, even if he wanted to, because he did not know where he was in the middle of the jungle where he had arrived by car/motorcycle/boat weeks or months before." SA. 67. This information was not contested, rejected or denied when it was relayed to the U.S. Probation Office and to the government. SA. 67-68.

In short, Mr. Da Conceicao's defense admitted that he acted criminally by agreeing to partake in the illegal flight and accepted prospective compensation (which he did not receive), but he did so under duress because the armed narcotraffickers and the FARC would not simply wave goodbye to him and wish him a merry trip back home, and because he was in the middle of nowhere. SA. 68.

Once again, the defense objected the dangerous weapon enhancement regarding the knife found on the plane. SA. 69. Mr. Da Conceicao argued that the enhancement was not warranted as the knife found is not large – as it was argued by the U.S Probation Office –, it was an instrument of flight, and because it is unfathomable to believe that over 400 kilograms of cocaine could be effectively defended with a knife." SA. 69. Specifically, the defense stated that "it is highly recommended that every pilot has some sort of knife accessible during flight." SA.

70. Articles from trade magazines were cited with pilots recommending knives, and some of the knives were in fact similar in shape and size to the one in the instant case. SA. 70-71. Furthermore, the defense stated that "there is no link between the knife and the underlying offense." SA. 70.

Another objection renewed by the defense in its sentencing memorandum was that Mr. Da Conceicao had a minimal role within the conspiracy, despite being a pilot. SA. 72. Specifically, the defense argued that Mr. Da Conceicao had scant understanding of the conspiracy's scope outside his own narrow role (he was provided the GPS coordinates without a clear understanding of where he was headed); he did not plan the crime and had no discretion in its execution; he relied on instructions from others at every stage; and his involvement lasted the time he was held in the encampment. SA. 73.

Finally, Mr. Da Conceicao's defense also highlighted that he should receive a sentence that avoids unwarranted disparities with his co-defendant – who received a sentence of 97 months of imprisonment – nor with similarly situated defendants throughout the United States. SA. 75-76.

The government submitted its sentencing memorandum on February 22, 2024. SA. 45. It argued that the Court should reject Mr. Da Conceicao's arguments against

the application of the 2-point dangerous weapon enhancement and for the application of a downward role adjustment. SA. 53.

Regarding the dangerous weapon enhancement, the government argued that Mr. Da Conceicao did not demonstrate "'special circumstances' rendering it 'clearly improbable' that the weapon was connected to the drug trafficking offense." *United States v. Lagasse*, 87 F.3d 18, 23 (1st Cir. 1996). SA. 54. The government concluded that "[t]he knife is not a multi-tool, it isn't a utility knife, it is a serrated bowie knife" and that "[t]he circumstances permit an inference that this knife served to protect the drugs or otherwise facilitate the drug smuggling venture." SA. 55.

The government further argued that no downward role adjustments apply to Mr. Da Conceicao, because "without his skill and participation, the venture would certainly have failed." SA. 55. It continued stating that "defendant knew about and understood a great deal of the scope and structure of the criminal activity" because "defendant told the USPO that he was privy to a discussion between the owner of the cocaine and the owners of the airplane." SA. 56. In sum, the government argued that Mr. Da Conceicao knew information that is not "freely provided to random interlopers." SA. 57.

Regarding the role adjustment, the government also argued that, "as the only one of the two participants who could fly the aircraft, his planning and command of

the flight was vital to the success of the importation venture" and he "recruited another person to come along to complete the job with him." SA. 56-57. Furthermore, it argued that "as a pilot, defendant had complete decision-making authority as to getting the aircraft from Venezuela to the United States." SA. 57. The government once again highlighted Mr. Da Conceicao's participation in the scheme and described it as an "extensive" one, because, as the pilot, he "was trusted with not only millions of dollars' worth of cocaine, but an aircraft" and therefore "he was trusted to complete the venture." SA. 57. Finally, the government stated that Mr. Da Conceicao "stood to benefit from a significantly larger share of the fruits of the crime." SA. 58.

The government moved on to discuss the departure for coercion or duress under U.S.S.G. § 5K2.12. It argued that Mr. Da Conceicao "never articulated an explicit or implicit threat to him, his co-defendant, or his family" but rather that he only "states that he 'understood' or 'felt' that he was 'not free to leave' the situation or refuse to fly the drugs to their intended location." SA. 58

The government also moved to request an upward departure under U.S.S.G. § 5K2.14 for National Security, Public Health, or Safety Significantly Endangered, arguing that national security, public health, and safety were significantly endangered by Mr. Da Conceicao's unauthorized breach of United States airspace

and unsanctioned flight over a populated area in an airplane fitted with a dangerous fuel system. SA. 58.

Finally, the government requested a sentence of 168 months of imprisonment for Mr. Da Conceicao. SA. 63.

### D. The sentencing hearing.

The sentencing hearing for Mr. Da Conceicao was held on February 23, 2024, before the Honorable Francisco A. Besosa. Counsel for Mr. Da Conceicao expressed that he had two objections to the PSR. A. 35-86. First, the defense addressed the objection to the dangerous weapon enhancement, explaining that "there is no true link between the knife and the transporting of kilos of cocaine" and that the knife in the airplane was "a necessary tool, an instrument for flight." A. 40-41. Counsel further stated that if Mr. Da Conceicao had been "traveling with books or monkeys or gold, he would have had that knife" anyway as it is not related to the cocaine that was on the flight. A. 42. Therefore, the defense submitted to the Court that the connection between the knife and the cocaine is clearly improbable.

The government replied that it agrees with the U.S. Probation Officer that this enhancement applies. A. 42-43. The government also brought an unannounced witness, a DEA special agent who is a pilot, Javier Calzada, to testify as to the matter

of the knife. Agent Calzada was in the intervention that led to Mr. Da Conceicao's arrest and seized the knife. A. 45.

Agent Calzada, who stated he had the functional equivalent of a PhD in flying, testified that the knife seized was not the kind of knife that he would normally carry with him on a flight and that he would consider the knife sufficient to defend a drug load. A. 45-46. During cross examination, Agent Calzada said that pilots "will carry something like a pocketknife or maybe a seat belt cutter or maybe scissors to cut through our seat belt in the event you land crash and you need to get out of the plane as soon as possible." A. 50. However, he was asked "if a pilot has a knife on him, is he in violation of the law?" He responded "No." A. 53. When answering questions from Judge Besosa, Agent Calzada clarified that knives are prohibited in the commercial side of the industry, like the airline industry. A. 53. However, when it comes to an aircraft like the one Mr. Da Conceicao piloted, he acknowledged that there is no prohibition to carry a knife because "that's considered general aviation" and therefore a pilot in general aviation may bring any type of knife on the plane. A. 54.

Then, the defense argued that after Agent Calzada's testimony bolstered its point because he admitted that it is not prohibited in general aviation for a pilot like Mr. Da Conceicao to carry a knife. A. 55. Therefore, Mr. Da Conceicao was authorized by law and by aviation standards to carry a knife because that is what is

expected, and there is no established criteria in the law or in aviation best practices for distinguishing this particular knife from others. A. 55. The defense also repeated its argument that a knife of this nature is not truly an instrument to defend 400 kilograms, worth millions of dollars of cocaine, but rather an instrument of flight acceptable in general aviation to avoid, as per the government´s witness, complicated crash landing scenarios. A. 55.

The government replied that the standard is that "it's clearly improbable that the knife was used in connection with the offense." A. 56. Regarding the testimony of Agent Calzada, the government highlighted that he stated that "a knife like that could defend kilograms of cocaine" and that "as a person… a knife like that would intimidate him." A. 56. Defense counsel added that even a pocketknife might intimidate anyone. A. 56.

Defense counsel moved on to the second objection to the PSR, which was that a minor role was not included for Mr. Da Conceicao. A. 57. The defense argued that Mr. Da Conceicao is less culpable than the other people involved in the drug venture in the grand scheme of things, as he did not control the drugs, the amount of drugs, nor could he determine when to fly or where to fly. A. 57. Furthermore, his directions were predetermined in the GPS system, he did not execute planning, and he was just the courier of the drugs. Counsel stated that the First Circuit has determined that even somebody transporting drugs is eligible for a minor role reduction. A. 57-58.

For these reasons, the defense argued that Mr. Da Conceicao qualified for the minor role deduction. A. 58.

The government reiterated its arguments from the sentencing memorandum regarding the five factors that the Court should consider when making its decision to grant a minor role reduction or not. A. 58. The government mentioned that Mr. Da Conceicao told the probation office that he was privy to conversations between owners of airplanes and drugs, that he knew specific details of the conspiracy, that he was involved in the preparations for the drug load, and that he recruited another person – his co-defendant – to come with him on this venture. It further argued that, as the pilot, Mr. Da Conceicao had complete authority to dictate what happened on the aircraft, and that he was supposed to get $150,000 from this venture. A. 58-61.

Defense counsel addressed some of the issues brought forth by the government while also preserving the duress defense arguments. A. 62. The defense clarified that Mr. Da Conceicao was not an active, affirmative participant in the conversations mentioned by the government, but rather that he had overheard them. Regarding being a pilot and exercising command, the defense argued that "anytime anybody flies a plane, there is a pilot" but this "doesn't mean that he was exercising control over the drug venture proper." A. 62. As to recruiting someone, defense counsel explained that it was necessary to have an assistant because of the nature of the flight. A. 62.

Furthermore, defense counsel argued that when Mr. Da Conceicao learned what the job was about, he was not in a position to leave. A. 63. He was surrounded by people with weapons in military fatigues, engaged in narcotrafficking activities. A. 63. Even if Mr. Da Conceicao tried to escape, he was in the middle of the jungle, in the Amazon, without knowing how he got there or how to get out. A. 63. The defense further mentioned that, even though Mr. Da Conceicao was in fact standing to benefit with $150,000, he was also told that the only way that he could get back home was for him to do the flight. A. 63.

Judge Besosa denied both objections from defense counsel. A. 63. The Court explained that it did not think that the knife and the amount of drugs made it clearly improbable that it was not used to protect the cocaine on board. A. 63-64. Regarding the minor role objection, the Court determined that many cases from the First Circuit hold that, in a border conspiracy, only the conduct relative to the offense is considered. A. 64. Judge Besosa considered the large amount of drugs, that Mr. Da Conceicao was the pilot of the venture, that he had discussions with persons who were the drug owners, knew specific details of the conspiracy, took a test flight as a part of the preparation for his flight on an aircraft that was not his, that he recruited another person, and that he was to receive twice as much money in payment than his co-defendant. A. 64.

Defense counsel moved on to his objection as to the lack of the departure under the duress defense in the PSR. A. 65. The defense argued that Mr. Da Conceicao acted under duress because he was not free to leave when he wanted. A.65. That even though there was not a blatant, explicit threat of physical harm like "we are going to kill you if you don't do that", "the underlying ambiance, the underlying ecosystem of that encampment was precisely that." A. 65. The people surrounding Mr. Da Conceicao had long weapons, dealt with drugs, with paramilitary activities, and "[a]nybody there would know not to cross those people." A. 66. For these reasons, the defense requested a departure under § 5K2.12 or a variance. A. 66.

The government replied by arguing that no threat was articulated to the Court in this case. A. 67. Nor an explicit threat or an implicit threat. It further mentioned that even if there is an element of danger in this case, the First Circuit has held that there has got to be a threat, and that the defendant stating that he believed he was not free to leave is not a threat. A. 68. Therefore, the government requested to the Court not to depart or vary pursuant to the duress defense. A. 68.

Mr. Da Conceicao replied that there was in fact an implicit threat in having "people in fatigues belonging to the FARC, with long weapons, and people involved in narcotrafficking activities in an encampment dedicated to this in the Venezuelan Amazon." A. 68-69. Therefore, "it is implicit that you can't leave, that you have to

do what you are told." A. 69. Furthermore, defense counsel argues that the fact that Mr. Da Conceicao was told that "the only way to get back home was to do this flight," is an implicit threat. A. 69.

Judge Besosa stated that "this is a close call." However, he expressed that he did not think that "a threat was articulated, and the Defendant's subjective belief that he was being threatened is not sufficient." Therefore, the objection was denied. A. 69.

The government recommended a sentence of 168 months of imprisonment, arguing that it is within the guideline range, even though it's at the high end of the range applicable to Mr. Da Conceicao, after applying the safety-valve, which the government ultimately did not object to. A. 72. The government justified requesting the high end sentence because "this is a case that falls on the outside of the norm of what we see in this District," as "there are virtually no other cases where people are bringing over 400 plus kilograms of cocaine on an airplane." A. 73. Mr. Da Conceicao-Level requested a sentence of 108 months based on his § 3553 factors and his previous arguments. A. 72.

After Mr. Da Conceicao's allocution, the Court found that a sentence at the low end of the guidelines range calculated by the U.S. Probation Office in the PSR "promotes respect for the law, protects the public from additional crimes by the

Defendant, and addresses the issues of deterrence and punishment." A. 82. Accordingly, Mr. Da Conceicao was sentenced to be committed to the custody of the United States Bureau of Prisons to be imprisoned for a term of 135 months, and to be placed on a supervised release for a term of five years. A. 35-36. Defense counsel objected to the sentence as being "procedurally and substantively unreasonable." A. 85.

On February 27, 2024, Mr. Da Conceicao filed a Notice of Appeal as to the Judgment entered in this case. A. 95

## SUMMARY OF THE ARGUMENT

Mr. Da Conceicao presents to this Court three arguments: (1) that a dangerous weapon enhancement under § 2D1.1(b)(1) was not warranted in this case; (2) that an adjustment for his minor role in the conspiracy was warranted under U.S.S.G § 3B1.2; and (3) that a departure for duress or coercion under U.S.S.G. § 5K2.12 was warranted.

As to the first argument, Mr. Da Conceicao submits that he presented enough evidence to prove that it was "clearly improbable" that the knife had a nexus with the offense. Specifically, he argues that the knife was an instrument of general aviation and was not used to protect the drugs. As to the second argument, Mr. Da Conceicao states that, even though his role was essential in the drug venture – he

was the pilot – he is less culpable than the other members of the conspiracy. Finally, Mr. Da Conceicao argues that he acted under duress or coercion, as an implicit threat was articulated and he did not have any other choice but to continue with the drug venture.

## **ARGUMENTS**

**I. The district court erred in applying the dangerous weapon enhancement to Mr. Da Conceicao under U.S.S.G. § 2D1.1(b)(1).**

While reviewing a district court's sentence, the Courts of Appeals "will accord due deference to the court's application of the sentencing guidelines to the facts." *United States v. Corcimiglia*, 967 F.2d 724, 726 (1st Cir. 1992) (citing *United States v. Bianco*, 922 F.2d 910, 911 (1st Cir. 1991); *United States v. Paulino*, 887 F.2d 358, 359 (1st Cir. 1989)). "Factbound matters related to sentencing need only be supported by a preponderance of the evidence and will be set aside only for clear error. *Corcimiglia*, 967 F.2d at 726 (citing *United States v. Camuti*, 950 F.2d 72, 74 (1st. Cir. 1991); *United States v. David*, 940 F.2d 722, 739 (1st Cir.) cert. denied, 502 U.S. 989 (1991); *United States v. Sklar*, 920 F.2d 107, 110-11 (1st Cir. 1990)).

Under U.S.S.G. § 2D1.1(b)(1), a two-level enhancement applies "[i]f a dangerous weapon (including a firearm) was possessed." The First Circuit has established that "a sentencing enhancement must be supported by a preponderance of the evidence." *United States v. Burgos-Figueroa*, 778 F.3d 310, 320 (1st Cir. 2015)

(citing *United States v. McDonald*, 121 F.3d 7, 9 (1ˢᵗ Cir. 1997)). To warrant an enhancement under U.S.S.G. § 2D1.1(b)(1), a certain nexus between the weapon and offense must be shown. *Lagasse*, 87 F.3d at 22.

For a district court's application of this enhancement, "a defendant need not be caught red-handed: the enhancement applies not only where a defendant himself possessed a firearm but also where it was reasonably foreseeable to the defendant that firearms would be possessed by others during the conspiracy*." Burgos-Figueroa*, 778 F.3d at 320 (citing *Bianco*, 922 F.2d at 912). The commentary to U.S.S.G § 2D1.1(b)(1) guides the district court to impose the dangerous weapon enhancement, "if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense." *Corcimiglia*, 967 F.2d at 726.

"Under sentencing guideline, once the underlying crime and presence of the firearm have been established, the burden then shifts to defendant to show or at least produce some evidence of existence of special circumstances that would render it clearly improbable that the weapon's presence has a connection to narcotic trafficking." *United States v. Gonzalez-Vazquez*, 34 F.3d 19, 24 (1ˢᵗ Cir. 1994) (citing *Corcimiglia*, 967 F.2d at 726).

The First Circuit has stated that the weapon's presence needs to imply "it's purpose to 'protect some aspect of the drug operation – e.g., the drugs or the

participants – even if it was not actually used to perpetrate the crime." *Lagasse*, 87 F.3d at 23. "Thus, [the First Circuit's] case law establishes only that a weapon's presence during the criminal activity will trigger the enhancement when the circumstances permit an inference that the weapon served to protect or otherwise facilitate the offense conduct." *Id*.

Mr. Da Conceicao objected continuously since the first Presentence Investigation Report the application of the enhancement of dangerous weapon under U.S.S.G § 2D1.1(b)(1) to his sentencing guidelines calculation. The knife found in the plane in which he was carrying the drugs was a flight instrument recommended in general aviation and in planes such as the one he was piloting. The government's witness during the sentencing said as much during his testimony. There are no aviation or other guidelines regarding which type of knife pilots should carry in general aviation, and any opinion as to which knife is acceptable and which one is not is mere speculation.

Furthermore, there is no nexus between the drug venture and the knife. Despite the fact that the knife was found on the plane, a simple knife is not a weapon strong or manageable enough to defend 400 kilograms of cocaine. It is clearly improbable that Mr. Da Conceicao could have defended the drugs, with this particular knife, against law enforcement authorities or any other individuals.

The government had to proof the nexus between the drug venture and the knife and to do so they brought a DEA agent – Agent Calzada – who is also a pilot and participated in the intervention against Mr. Da Conceicao. Agent Calzada stated that "as a person, a knife like that would intimidate him." However, as defense counsel mentioned in the sentencing hearing "a pocketknife might intimidate anyone." Just because a weapon is intimidating to a person, it does not mean it is enough to defend 400 kilograms of cocaine. This is not enough evidence to proof that the knife was used to protect the drugs.

Furthermore, the defense presented enough evidence to prove that the knife was used as an aviation instrument, therefore proving that it is clearly improbable that Mr. Da Conceicao used the knife as a weapon to protect the drugs. The defense cited many articles that recommend pilots to carry a knife on the plane as an instrument for protection if the plane lands in inhospitable terrain or seat belts need to be removed. When Agent Calzada was asked about these articles, he simply said he had not read them. The defense did not have the opportunity to confront Agent Calzada with these articles during the sentencing hearing because the witness was unannounced. However, the articles were presented to the Court and, at the end of the day, it was clear that the best practice in aviation, and the consistent recommendations from expert and trade magazines, is for pilots to carry knives as flight instruments in case of emergency landings. This fact, combined with the

unreasonableness of thinking that it is possible that a knife that small would be successfully used to protect 400 kilograms of cocaine, makes it clearly improbable that the knife was used as a dangerous weapon to protect the drug venture. For these reasons, Mr. Da Conceicao argues that he met his burden of proving that it is clearly improbable that the knife was used to protect the drug.

Therefore, Mr. Da Conceicao respectfully requests that this Honorable Court reverse the District Court's decision of applying the two-level enhancement under U.S.S.G. § 2D1.1(b)(1) and, accordingly, remands this case for re-sentencing.

## II.    The district court erred in denying Mr. Da Conceicao a mitigating role adjustment under U.S.S.G. § 3B1.2

Preserved claims of error are reviewed under the abuse-of-discretion standard. *Gall v. United States*, 552 U.S. 38, 46, 128 S.Ct. 586 (2007). Under this standard of review, the appellate courts "assay the sentencing court's factual findings for clear error and evaluate its legal conclusions de novo." *United States v. Rivera-Berríos*, 968 F.3d 130, 134 (1st Cir. 2020) (citing *United States v. Díaz-Lugo*, 963 F.3d 145, 151 (1st Cir. 2020) and *United States v. Flores-Machicote*, 706 F.3d 16, 20 (1st Cir. 2013). Specifically, the appellate court "first examines the sentence for procedural errors and examines the substantive reasonableness of a sentence only after it has passed procedural muster." *Rivera-Berríos*, 968 F.3d at 134. Then the court is to review a sentence to determine if it will grant or deny a mitigating role adjustment.

The review for mitigating role adjustment is "generally deferential." *United States v. Vargas*, 560 F.3d 45, 48 (1st Cir. 2009) (quoting *United States v. Graciani*, 61 F.3d 70, 75 (1st Cir. 1995)). Therefore, this Honorable Court reviews a District Court's resolution of the facts relative to a minor role adjustment for clear error, applications of law to those raw facts somewhat less deferentially, and purely legal questions de novo." *United States v. Quiñones-Medina*, 553 F.3d 19, 22 (1st Cir. 2009).

Under U.S.S.G § 3B1.2, a defendant whose "part in committing the offense … makes him less culpable than the average participant in the criminal activity" is entitled to a reduction of either four, three or two levels. U.S.S.G § 3B1.2, cmt. n.3(A). As per the commentary in U.S.S.G § 3B1.2(b), when determining if a defendant should be granted a mitigating role adjustment courts are to consider a list of five non-exhaustive factors "to determine the defendant's role relative to other participants in the crime." *United States v. Rodríguez*, 44 F.4th 1229, 1234-35 (9th Cir. 2022) (citations omitted). "[T]he touchstone of a § 3B1.2 adjustment is the defendant's relative culpability." *United States v. Demers*, 13 F.3d 1381, 1384 (9th Cir. 1994). A minor participant is one whose role was not minimal, but who was still less culpable than most other participants. U.S.S.G § 3B1.2 cmt. n.5.

In evaluating a potential reduction for a minor role adjustment, courts consider the following factors:

(i)     the degree to which the defendant understood the scope and structure of the criminal activity;

(ii)    the degree to which the defendant participated in planning or organizing the criminal activity;

(iii)   the degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority;

(iv)   the nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts;

(v)    the degree to which the defendant stood to benefit from the criminal activity.

*United States v. Arias-Mercedes*, 901 F.3d 1, 7-8 (1st Cir. 2018).

Mr. Da Conceicao did not fully understand the details of the broader conspiracy. He did not accept the job at the moment it was offered, but rather acquiesced solely to see what it was about. After a trip that involved a long drive, and crossing a river, he ended in the jungle, at the Venezuelan part of the Amazons. He was received by intimidating and threatening individuals who told him that the only way to get home was to complete the drug venture and flying the plane. He did

not know where he was going, as the GPS already had the coordinates for him to follow.

The government claims that Mr. Da Conceicao knew specific details of the conspiracy because he was an important trusted member of it. However, every detail of information known by Mr. Da Conceicao he obtained while overhearing conversations while he was stuck in the middle of nowhere. He did not have any say in these conversations. He was just an instrument. The instrument that was going to fly the drug to the destination with coordinates the leaders of the conspiracy put on the GPS that Mr Da Conceicao used for the flight.

The government further claims that Mr. Da Conceicao was involved in the preparation of the venture, as he tested the plane and recruited someone to fly with him. We cannot forget that Mr. Da Conceicao was there under duress. The precautions he took were reasonable for him in order to protect his safety while flying. Even though he was an essential part of the conspiracy, he was less culpable than every other member of the conspiracy who dealt with drugs and who protected them with firearms. Everything that Mr. Da Conceicao actively did was regarding the plane and the act of safely flying it, because that was his only role.

Promised compensation (never received) is not what made Mr. Da Conceicao stay. He stayed because he felt threatened by the very dangerous narcotraffickers

who told him that the only way for him to go home was to complete the venture. Furthermore, even if he did not feel threatened, he had nowhere to go in the middle of the jungle. He had no other option.

For these reasons, Mr. Da Conceicao is substantially less culpable than the others who participated in the conspiracy. Therefore, the reduction for a minor role should have been applied, and, as a consequence, the court failed to correctly calculate Mr. Da Conceicao's sentencing guidelines because it failed to apply a mitigating role adjustment that would have warranted Mr. Conceicao either a two, three or four level reduction in his total offense level. §§ 3B1.2(a) and (b).

## III. The district court erred in denying Mr. Da Conceicao a departure for duress or coercion under U.S.S.G. § 5K2.12.

The Court of Appeals "review a district court's discretionary refusal to depart from the guideline range for reasonableness." *United States v. Rodríguez-Santos*, 56 F.4th 206, 221 (1st Cir. 2022) (quoting *United States v. Herman*, 848 F.3d 55, 58 (1st Cir. 2017)). The described approach "accords with a deferential abuse of discretion standard and recognizes the 'substantial discretion vested in a sentencing court.'" *Rodríguez-Santos*, 56 F.4th at 221 (quoting *Flores-Machicote*, 706 F.3d at 20).

The duress defense has three elements: (1) immediate threat of serious bodily injury or death; (2) well-grounded belief that threat will be caried out; and (3) no

reasonable opportunity to escape or otherwise to frustrate threat. *U.S. v. Arthurs*, 73 F.3d 444, 448 (1ˢᵗ Cir. 1996) (citing *United States v. Amparo*, 961 F.2d 288, 291 (1ˢᵗ Cir. 1992). "The defendant has a burden of producing enough evidence to support a finding of duress." *Amparo*, 961 F.2d at 291. However, "a jury's rejection of a duress defense does not necessarily preclude a sentencing court's downward departure under U.S.S.G. § 5K1.12. *Id.* at 292. Defendant bears the burden of proof by the preponderance of the evidence of showing eligibility for Guidelines departure. *United States v. Rizzo*, 121 F.3d 794, 801 (1ˢᵗ Cir. 1997).

Mr. Da Conceicao presented the District Court with real evidence that he acted under duress. As he relayed to the government and the U.S. Probation Office, he was transported from Brazil to Venezuela under the promise of work transporting items related to mining; the trip was a long one in which cars, motorcycles and boats were required; once he arrived at the location, he was guarded and surrounded by armed members of what appeared to be a paramilitary and/or narcotrafficking organization; he could not leave because he understood that, if he attempted to do so, he would be killed as he had by then learned what was going on in the encampment; and he could not simply leave, even if he wanted to, because he did not know where he was in the middle of the jungle where he has arrived by car/motorcycle/boat weeks or months before.

At the sentencing hearing, the district judge clearly stated that this was a "close call" for him. Judge Besosa decided against the downward departure because he did not think "that a threat was articulated" and that Mr. Da Conceicao's "subjective belief that he was being threatened is not sufficient." However, there was a real threat articulated: the defendant was told that the only way to get back home was to do this flight. These words coming from individuals in fatigues belonging to the FARC, with long weapons, and people involved in narcotrafficking activities in an encampment dedicated to this in the middle of the Venezuelan Amazon, is a real threat to any person. Nobody would think there was an option to leave and not do the job. A paramilitary outfit of the FARC or their descendants, embedded or wedded with narcotraffickers, can surely make threats with the waive of a weapon or through a certain look – and anyone with common sense will understand that to be a threat irrespective of whether it was literally or verbally articulated.

Therefore, Mr. Da Conceicao did prove to the District Court that he acted under duress and that there was a clear and real implicit threat that made him do what he did in the conspiracy. For these reasons, Mr. Da Conceicao respectfully requests from this Court that a downward departure under U.S.S.G. § 5K1.12 be applied and, as a consequence, this case be remanded for re-sentencing.

## CONCLUSION

Mr. Da Conceicao's sentencing guidelines were incorrectly calculated by the district court, as the dangerous weapon enhancement was incorrectly applied in this case after Mr. Conceicao met his burden of proving that it was clearly improbable that the knife – which was an instrument of general aviation – was used to protect the drug venture. The sentencing guidelines applied to Mr. Da Conceicao were also incorrect due to the district court's denial of the reduction that was warranted for Mr. Da Conceicao being a minor participant in the conspiracy. Furthermore, a departure for duress of coercion was warranted because Mr. Da Conceicao presented evidence of a real implicit threat, which made him act under duress.

Wherefore, Mr. Da Conceicao respectfully requests that this Honorable Court remands this case for re-sentencing accordingly to the arguments presented in this appeal brief.

**RESPECTFULLY SUBMITTED.**

In San Juan, Puerto Rico, this 5th day of December, 2024.[4]

## **REQUEST FOR ORAL ARGUMENT**

Mr. Da Conceicao, through undersigned counsel, respectfully requests oral argument on the questions that were presented and discussed in this appeal.

---

[4] Counsel apologizes for filing this appeal one day after the Court's stated deadline. Counsel mistakenly thought the deadline was due today.

## CERTIFICATE OF COMPLIANCE

This brief contains _____ words, and therefore complies with the type-volume limitation of Fed. R. App. Pro. Rule 32(a)(7)(B). It also complies with the typeface requirements provided in Fed. R. App. Pro. Rule 32(a)(5) and the style requirements of Fed. R. App. Pro. Rule 32(a)(6) as it has been prepared using Times New Roman font, 14-point proportional type size.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on this date, I electronically filed the foregoing motion with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the parties of record.

**I FURTHER CERTIFY** that on December 5, 2024, I sent to Mr. Nivaldo Da Conceicao-Level a copy of the foregoing document by United States mail at FCI Oakdale I, P.O. Box 5000, Oakdale, L.A. 71463.

_**S/Leonardo M. Aldridge**_
Leonardo M. Aldridge
Counsel for the Defendant
Bar # 15847
ECIJA-SBGB Law Offices
Miramar Plaza, Second Floor
P.O. Box 363068
San Juan, P.R. 00907
Phone: (787) 370-9024
E-mail: leoaldridge@hotmail.com

# United States Court of Appeals
## For the First Circuit

_____

No. 24-1235


UNITED STATES

Appellee,

v.

NIVALDO DA CONCEICAO-LEVEL,

Defendant - Appellant.

_____

On appeal from the United States District Court
for the District of Puerto Rico

_____

**ADDENDUM**

_____

Leonardo M. Aldridge
Counsel for the Defendant
First Circuit Bar #15847
ECIJA-SBGB Law Offices
Miramar Plaza, Second Floor
P.O. Box 363068
San Juan, P.R. 00907
Phone: (787) 370-9024
E-mail: leoaldridge@hotmail.com

# **TABLE OF CONTENTS**

**Page(s):**

Judgment, Docket No. 116 (dated February 23, 2024)……………………………..1

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
Sheet 1

# UNITED STATES DISTRICT COURT

District of Puerto Rico

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | **JUDGMENT IN A CRIMINAL CASE** |
| v. | ) | |
| Nivaldo DA CONCEICAO-LEVEL (2) | ) | Case Number:  3:22-CR-00490-02 (FAB) |
| | ) | USM Number:  31205-510 |
| | ) | Leonardo M. Aldridge, Esq. |
| | ) | Defendant's Attorney |

## THE DEFENDANT:

☑ pleaded guilty to count(s)    Counts One (1) through Six (6) of the Indictment on 11/02/2023.

☐ pleaded nolo contendere to count(s) _____
   which was accepted by the court.

☐ was found guilty on count(s) _____
   after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 21 USC §§841(a)(1) and 846 | Narcotics Conspiracy | 11/11/2022 | One (1) |
| 21 USC §841(a)(1) and 18 USC §2 | Possession with Intent to Distribute Narcotics Aiding and Abetting | 11/11/2022 | Two (2) |
| 21 USC §§952(a), 960, and 963 | Narcotics Importation Conspiracy | 11/11/2022 | Three (3) |

The defendant is sentenced as provided in pages 2 through ___8___ of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s) _____

☐ Count(s) _____ ☐ is ☐ are dismissed on the motion of the United States.

    It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

2/23/2024
_____
Date of Imposition of Judgment

/S/ FRANCISCO A. BESOSA
_____
Signature of Judge

Francisco A. Besosa, Senior U.S. District Judge
_____
Name and Title of Judge

2/23/2024
_____
Date

1

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
Sheet 1A

Judgment—Page   2   of   8  

DEFENDANT:  Nivaldo DA CONCEICAO-LEVEL (2)
CASE NUMBER:  3:22-CR-00490-02 (FAB)

## ADDITIONAL COUNTS OF CONVICTION

| <u>Title & Section</u> | <u>Nature of Offense</u> | <u>Offense Ended</u> | <u>Count</u> |
|---|---|---|---|
| 21 USC §§952(a) and 960, and 18 USC §2 | Narcotics Importation Aiding and Abetting | 11/11/2022 | Four (4) |
| 21 USC §955, 960, and 963 | Conspiracy to Possess Controlled Substances Aboard an Aircraft | 11/11/2022 | Five (5) |
| 21 USC §§955 and 960 and 18 USC §2 | Possession of Controlled Substances Aboard an Aircraft Aiding and Abetting | 11/11/2022 | Six (6) |

2

AO 245B (Rev. 09/19) Judgment in Criminal Case
Sheet 2 — Imprisonment

DEFENDANT:   Nivaldo DA CONCEICAO-LEVEL (2)
CASE NUMBER:   3:22-CR-00490-02 (FAB)

# IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of:
> One hundred and thirty-five (135) months.

☑  The court makes the following recommendations to the Bureau of Prisons:
  Defendant be provided of any vocational training courses and English as second language courses.
  The Court recommends the defendant be designated to any institution in Fl.

☑  The defendant is remanded to the custody of the United States Marshal.

☐  The defendant shall surrender to the United States Marshal for this district:

  ☐  at _____  ☐ a.m.  ☐ p.m.  on _____ .

  ☐  as notified by the United States Marshal.

☐  The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

  ☐  before 2 p.m. on _____ .

  ☐  as notified by the United States Marshal.

  ☐  as notified by the Probation or Pretrial Services Office.

# RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

at _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

AO 245B (Rev. 09/19)  Judgment in a Criminal Case
                      Sheet 3 — Supervised Release

Judgment—Page  4  of  8

DEFENDANT:  Nivaldo DA CONCEICAO-LEVEL (2)
CASE NUMBER:  3:22-CR-00490-02 (FAB)

# SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of:

Five (5) years.

# MANDATORY CONDITIONS

1.  You must not commit another federal, state or local crime.
2.  You must not unlawfully possess a controlled substance.
3.  You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.
     ☑ The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse. *(check if applicable)*
4.  ☐ You must make restitution in accordance with 18 U.S.C. §§ 3663 and 3663A or any other statute authorizing a sentence of restitution. *(check if applicable)*
5.  ☑ You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*
6.  ☐ You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
7.  ☐ You must participate in an approved program for domestic violence. *(check if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
Sheet 3A — Supervised Release

Judgment—Page __5__ of __8__

DEFENDANT:  Nivaldo DA CONCEICAO-LEVEL (2)
CASE NUMBER:  3:22-CR-00490-02 (FAB)

# STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1.  You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2.  After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3.  You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4.  You must answer truthfully the questions asked by your probation officer.
5.  You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6.  You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7.  You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8.  You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9.  If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10. You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11. You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12. If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk.
13. You must follow the instructions of the probation officer related to the conditions of supervision.

## U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.

Defendant's Signature _____    Date _____

AO 245B (Rev. 09/19)    Case 3:22-cr-00490-FAB    Document 116    Filed 02/23/24    Page 6 of 8
Judgment in a Criminal Case
Sheet 3D — Supervised Release

Judgment—Page __6__ of __8__

DEFENDANT:  Nivaldo DA CONCEICAO-LEVEL (2)
CASE NUMBER:  3:22-CR-00490-02 (FAB)

## SPECIAL CONDITIONS OF SUPERVISION

1. He shall observe the standard conditions of supervised release recommended by the United States Sentencing Commission and adopted by this Court.

2. If ordered deported from the United States, he must remain outside the United States, unless legally authorized to re-enter the Unites States. If he re-enters the United States, he must report to the nearest probation office within 72 hours after his return.

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
                 Sheet 5 — Criminal Monetary Penalties

Judgment — Page   7   of   8

DEFENDANT: Nivaldo DA CONCEICAO-LEVEL (2)
CASE NUMBER: 3:22-CR-00490-02 (FAB)

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | Assessment | Restitution | Fine | AVAA Assessment* | JVTA Assessment** |
|---|---|---|---|---|---|
| **TOTALS** | $ 600.00 | $ | $ | $ | $ |

☐ The determination of restitution is deferred until _____. An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss*** | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| | | | |

| | | | |
|---|---|---|---|
| **TOTALS** | $ 0.00 | $ 0.00 | |

☐ Restitution amount ordered pursuant to plea agreement  $ _____

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

    ☐ the interest requirement is waived for the   ☐ fine   ☐ restitution.

    ☐ the interest requirement for the   ☐ fine   ☐ restitution is modified as follows:

\* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299.
\*\* Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
\*\*\* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
Sheet 6 — Schedule of Payments

Judgment — Page ___8___ of ___8___

DEFENDANT:  Nivaldo DA CONCEICAO-LEVEL (2)
CASE NUMBER:  3:22-CR-00490-02 (FAB)

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

**A**  ☑  Lump sum payment of $ __600.00__  due immediately, balance due

    ☐  not later than _____ , or
    ☐  in accordance with  ☐ C,   ☐ D,   ☐ E, or   ☐ F below; or

**B**  ☐  Payment to begin immediately (may be combined with   ☐ C,   ☐ D, or   ☐ F below); or

**C**  ☐  Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period of
_____ *(e.g., months or years)*, to commence _____ *(e.g., 30 or 60 days)* after the date of this judgment; or

**D**  ☐  Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period of
_____ *(e.g., months or years)*, to commence _____ *(e.g., 30 or 60 days)* after release from imprisonment to a
term of supervision; or

**E**  ☐  Payment during the term of supervised release will commence within _____ *(e.g., 30 or 60 days)* after release from
imprisonment.  The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

**F**  ☐  Special instructions regarding the payment of criminal monetary penalties:

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during the period of imprisonment.  All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐  Joint and Several

| Case Number<br>Defendant and Co-Defendant Names<br>*(including defendant number)* | Total Amount | Joint and Several<br>Amount | Corresponding Payee,<br>if appropriate |
|---|---|---|---|
| | | | |

☐  The defendant shall pay the cost of prosecution.

☐  The defendant shall pay the following court cost(s):

☑  The defendant shall forfeit the defendant's interest in the following property to the United States:
    Mr. Da Conceicao shall forfeit all rights and interest to any property subject to forfeiture as outlined in Paragraphs seven, eight, and nine of the Indictment.

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of prosecution and court costs.